*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 24-CF-0474

TREVON HATCHERSON-ROSS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2023-CF2-001694)

(Andrea L. Hertzfeld, *Judge*)

(Submitted February 26, 2026                    Decided August 6, 2026)

*Anne Keith Walton* and *David H. Reiter* were on the briefs for appellant.

*David P. Saybolt*, Assistant United States Attorney, with whom *Jeanine Ferris Pirro*, United States Attorney, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, *Michael Lee*, and *Patricia Mpasi*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH, EASTERLY, and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*: Two police officers saw Trevon Hatcherson-Ross walking along a sidewalk late one afternoon and one noticed an "L-shaped" bulge in his waistband. When the officers approached Hatcherson-Ross to investigate, he broke into a sprint and led them on a forty-second foot chase that ended with him

climbing over a tall fence leading to the backyard of a private residence. The officers eventually entered the backyard, spotted Hatcherson-Ross hiding under a porch, grabbed his arms, and directed him to come out. He complied and slid out from under the porch. The officers then searched the backyard, where they recovered a gun from inside a storage bin underneath the porch, and at some point they also recovered a round of ammunition from Hatcherson-Ross's pocket. They placed Hatcherson-Ross under arrest.

Hatcherson-Ross moved to suppress the gun and ammunition as the fruits of an unlawful seizure, arguing that he was seized before he jumped the fence into the backyard. The trial court denied the motion, reasoning that Hatcherson-Ross had abandoned the gun before it was found so that he relinquished any expectation of privacy in it. Hatcherson-Ross was then convicted at trial of various offenses related to his unlawful possession of a firearm.

On appeal, Hatcherson-Ross reiterates his argument that the trial court erred by denying his motion to suppress because he was unlawfully seized before he fled into the backyard. We disagree. In our view, Hatcherson-Ross was not seized until officers grabbed him and directed him to come out from under the porch. Hatcherson-Ross does not argue that they lacked reasonable suspicion to seize him at that point. And the search the police subsequently conducted of the backyard and

storage bin that revealed Hatcherson-Ross's gun did not implicate his Fourth Amendment interests. That is because Hatcherson-Ross had no expectation of privacy in the private property of a stranger, rendering any question of abandonment irrelevant to the legality of the search. We thus affirm his convictions.

## I. Background

Hatcherson-Ross was walking along a sidewalk late one afternoon as Officer Donald Green drove by in his marked police vehicle. As Green pulled up alongside Hatcherson-Ross, he noticed an "upside down L-shaped object" in the front of Hatcherson-Ross's waistband. Believing the object to be a gun, Green asked Hatcherson-Ross through the car window to "do [him] a favor and take your hand out of your pocket." Green's body-worn camera (BWC) footage shows Hatcherson-Ross take his hand out of his jacket pocket, and he responded, "Sir, I'm not bothering" anybody, and he continued along his way. Green then continued to follow Hatcherson-Ross as he radioed for backup.

Officer Raymond Gonzalez responded to the scene. Hatcherson-Ross was between the two officers' cars, with Gonzalez's car ahead of him and Green's car still trailing behind him. Green then got out of his car, pointed at Hatcherson-Ross, and twice told him to get "on the ground." Hatcherson-Ross ignored Green and kept walking in the direction of Gonzalez's car. Green then started jogging toward

Hatcherson-Ross and repeatedly called out to Gonzalez, "don't let him pass you," as Hatcherson-Ross tried to walk past Gonzalez's car. Gonzalez then got out of his car and told Hatcherson-Ross to "hold on" a few times. Hatcherson-Ross kept walking past the passenger side of Gonzalez's car, and Gonzalez moved to intercept him. As Gonzalez got closer, he told Hatcherson-Ross: "Stop. Don't you dare fucking reach in your jacket." At that point, Hatcherson-Ross grabbed his waistband and immediately broke into a sprint past Gonzalez. Gonzalez chased Hatcherson-Ross for about forty seconds until Hatcherson-Ross climbed over a fence that led to somebody's backyard.

Officers eventually entered the backyard and an officer spotted Hatcherson-Ross hiding underneath the porch. In Green's suppression hearing testimony, he stated that the officers then "ordered the defendant to come out and he came out" from under the porch. Officer testimony at trial described things a bit differently, though we attach no material importance to this discrepancy: the uncontroverted testimony was that the officers first grabbed Hatcherson-Ross's arms while he hid under the porch, then directed him to "[s]lide out," and Hatcherson-Ross then came "out under his own power." The officers then canvassed the area and located a firearm in a storage bin under the porch, and they also recovered one round of ammunition from Hatcherson-Ross's pocket. The officers later contacted the homeowner, who had been away, and she told them she did not own a firearm, she

did not give anybody permission to be on her property, and she did not know who Hatcherson-Ross was.

Hatcherson-Ross was charged with several offenses related to his unlawful possession of a firearm and ammunition. Before trial, he moved to suppress the firearm and ammunition as the fruit of an unlawful seizure—he did not seem to challenge the legality of the search of the backyard or of his person, aside from arguing that the evidence those searches uncovered was the fruit of the unlawful seizure. The government countered that Hatcherson-Ross abandoned his firearm and lacked "standing to contest" its admissibility. The trial court held a suppression hearing, at which Officer Green was the sole witness. He largely testified to the events recounted above, *but see infra* at note 1, and the government introduced both his and Officer Gonzalez's BWC footage. Hatcherson-Ross argued at the close of evidence that he was unlawfully seized at least by the time Green told him to get on the ground and that both the firearm and the ammunition were fruits of that unlawful seizure. The government countered that Hatcherson-Ross was not seized until after he entered the backyard and that officers had reasonable articulable suspicion to support that seizure. The government further argued that Hatcherson-Ross did not have any privacy interest in his firearm because he had abandoned it and thus lacked standing to challenge its admission.

In denying the suppression motion, the trial court reasoned that the officers' initial approach of Hatcherson-Ross was a mere attempt to "make a contact," and "not necessarily a stop." The court credited Green's testimony that he saw a distinctive L-shaped bulge suggestive of a firearm on Hatcherson-Ross during that initial approach. The court did not make any finding about whether or when the officers had reasonable suspicion to stop Hatcherson-Ross, reasoning instead that any stop occurred after Hatcherson-Ross had abandoned the gun under the porch so he did not have any "legitimate expectation of privacy" in the gun.

A jury convicted Hatcherson-Ross on all counts. Hatcherson-Ross now appeals, challenging only the trial court's denial of his suppression motion.

## II. Analysis

On appeal, Hatcherson-Ross maintains that he was unlawfully seized when Officers Green and Gonzalez tried to initiate a stop on the street without reasonable articulable suspicion that he was engaged in criminal activity. He contends that the evidence recovered after he fled from the officers—the firearm in the storage bin and the ammunition from his pocket—was causally linked to that unlawful seizure and thus should have been suppressed. The government counters that Hatcherson-Ross was not seized until after he abandoned the gun under the porch so that his Fourth Amendment interests were not implicated by the discovery of the firearm.

We first address the threshold question of when Hatcherson-Ross was seized and agree with the government that it did not occur until after he hid under the porch. Hatcherson-Ross does not contest that the officers had reasonable suspicion to seize him at that point. We then explain why Hatcherson-Ross's Fourth Amendment interests were not implicated by the officers' search of a stranger's backyard and storage bin, which led to the discovery of his gun, because he had no privacy interests in those areas. Whether he abandoned his gun is thus ultimately of no moment, as we explain, so we give minimal consideration to that hotly debated issue.

### A. Hatcherson-Ross was not seized until after he hid under the porch

An individual can be seized under the Fourth Amendment, thereby requiring some adequate legal justification for the seizure, in two distinct ways. A seizure "requires *either* physical force," such as where an officer grabs an individual with an intent to restrain them, "*or*, where that is absent, *submission* to the assertion of authority," such as where an officer directs a person to stop and they comply. *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *see also United States v. Pope*, 313 A.3d 565, 572 (D.C. 2024). "Thus, a police order to stop is not a seizure if the person does not submit to the official command." *Pope*, 313 A.3d at 572. Hatcherson-Ross does not contend that officers applied any physical force to him before he hid under the porch, so his argument that he was seized before then

depends on whether he submitted to the officers' show of authority at some earlier point.

In Hatcherson-Ross's view, there was a police show of authority when Green asked him to "do me a favor" and to take his hand out of his pocket, and Hatcherson-Ross submitted to that authority when he complied with that request, thus amounting to a seizure. This court has previously and repeatedly rejected the argument that a mere request to take one's hands out of their pockets while speaking to police is a sufficient show of authority to implicate the Fourth Amendment. *See Maye v. United States*, 314 A.3d 1244, 1249, 1255 (D.C. 2024) (officer's request, "would you mind taking your hand out of your pocket," plus compliance did not amount to a seizure); *United States v. Barnes*, 496 A.2d 1040, 1044-45 (D.C. 1985) (officer's request to defendant to remove his hands from his pockets, where there were no indications of "intimidating" circumstances, did not amount to a show of authority sufficient to constitute a seizure). In *Barnes*, we observed that an officer's request to remove one's hands from their pockets is "no more intrusive than a request for identification," 496 A.2d at 1045, which is "something officers can do without initiating a Fourth Amendment seizure," *Sharp v. United States*, 132 A.3d 161, 167 (D.C. 2016) (citing *Barnes*, 496 A.2d at 1045). The same analysis applies here: Green's mere request that Hatcherson-Ross take his hand out of his pocket, which

did not have the tone or phrasing of a strict command, plus Hatcherson-Ross's compliance with that request did not amount to a seizure.

Aside from that initial request, Hatcherson-Ross highlights what are undoubtedly more forceful shows of authority, such as when the officers directed him to "get on the ground" and to "hold on" as he continued to walk away from them. The problem with Hatcherson-Ross's reliance on these commands is that he clearly did not "submit" to them—that is, he did not get on the ground or stop—but instead fled from the officers shortly after they issued those directives. That lack of submission means that there was no seizure at those points either. *See Pope*, 313 A.3d at 572; *Crews v. United States*, 263 A.3d 128, 135 (D.C. 2021) ("In addition to a show of authority, for there to be a seizure the apprehended person must submit to the show of authority.").

Because the police did not make any physical contact with Hatcherson-Ross and he did not submit to any sufficient show of authority before he hid under the porch, we reject Hatcherson-Ross's argument that he was seized before that point.[1]

---

[1] As indicated above, there is a discrepancy in the suppression hearing testimony and the trial testimony about whether officers grabbed Hatcherson-Ross before he came out from under the porch, as the trial testimony indicated, or if instead officers directed him to come out and he complied, as the suppression

*B. Hatcherson-Ross's Fourth Amendment interests were not implicated by the search of the backyard or storage bin*

Hatcherson-Ross next argues that the trial court erred in concluding that he abandoned his gun when he put it in a storage bin located in a stranger's backyard. The government defends the trial court's abandonment ruling.

In our view, the trial court's abandonment ruling and the parties' focus on it in their briefs suffers from some analytical confusion. Both the parties and the trial court spent considerable time arguing over whether Hatcherson-Ross abandoned his gun by placing it in a stranger's backyard storage bin and remaining near it. We seriously doubt it, given his close proximity to the gun and his obvious desire to keep it hidden prior to his seizure. *See Biles v. United States*, 101 A.3d 1012, 1015,

---

hearing testimony indicated. We attach no significance to this difference in the testimony because Hatcherson-Ross contends only that he was seized before he hid under the porch, and this discrepancy is immaterial to that question. If the discrepancy mattered to anything, we might have to confront some uncertainty in our caselaw about whether we can consider undisputed trial testimony that undermines a suppression ruling. *See Mayo v. United States*, 315 A.3d 606, 623 n.8 (D.C. 2024) (en banc) ("We have previously recognized our ability to consider undisputed trial testimony in reviewing a ruling on a motion to suppress," but "our decisions are inconsistent as to whether such undisputed testimony may only be used to uphold the trial court's suppression ruling, or whether it may also be used to support a conclusion that the court erred in denying suppression." (citations omitted)); *see also id.* at 641 (McLeese, J., dissenting) (doubting the "wisdom and fairness" of permitting consideration of such testimony to either support or undermine a suppression ruling). We thankfully need not confront that question here.

1024-25 (D.C. 2014) (holding that suspect did not abandon property that he hid on public property eight feet away from him).

And yet, whether Hatcherson-Ross abandoned the gun is immaterial to whether the officers invaded any Fourth Amendment interest of his when they searched a stranger's backyard and storage bin, leading to the gun's discovery.[2] When the officers observed the gun after opening the bin, they implicated no privacy interest of Hatcherson-Ross's—only the home's residents and those authorized to store things in the bin had their privacy interests affected when the officers opened it. And once the officers opened the bin, the gun itself was in plain view, rendering

---

[2] At times, both the trial prosecutor and the trial court suggested that, if Hatcherson-Ross abandoned his gun, then he "doesn't have standing to contest" its recovery and the court did not "have to get to the question of whether" he was unlawfully seized before that alleged abandonment. That's wrong: "In order to be effective, abandonment must be voluntary. It is considered involuntary if it results from a violation of the Fourth Amendment," and "[p]roperty is considered to have been involuntarily abandoned if the defendant discards it as a consequence of illegal police conduct." *Johnson v. United States*, 253 A.3d 1050, 1061 (D.C. 2021) (quoting *Brown v. United States*, 97 A.3d 92, 97 n.5 (D.C. 2014)). It is also somewhat confused in its phrasing. The Supreme Court "dispens[ed] with the rubric of standing" for Fourth Amendment purposes almost fifty years ago, and reoriented the doctrine toward "a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978). It is a misnomer to describe that substantive question as if it were a standing concern.

abandonment immaterial to its discovery.[3] The result would be no different if Hatcherson-Ross had kept his gun in his hand as he ran from officers. In that case, he clearly would not have abandoned the gun, but the officers would not have committed any search at all in noticing what was in front of their faces. Here, while they did conduct a search of the yard and bin, those searches did not implicate any Fourth Amendment interest of Hatcherson-Ross's.

That is why—outside of challenges to the seizure of property, which are not raised here—abandonment tends to be a relevant doctrine only when the allegedly-abandoned property in question is a container or other receptacle that must *itself* be searched. *See, e.g., Pope*, 313 A.3d at 576-79 (examining whether defendant had

---

[3] The government dedicates half a sentence to this point in its brief, positing that "when police opened the storage container, in which Hatcherson-Ross could have no reasonable expectation of privacy, the gun was in plain view and there was no search to suppress." That's exactly right, save for a nitpicky terminological quibble that fruits of searches are suppressed, not the searches themselves. Hatcherson-Ross conceivably could have mounted some challenge to the *seizure* of his gun as opposed to the search that led to its discovery, and abandonment might have been relevant to that challenge. But Hatcherson-Ross has never challenged the seizure of his gun, and it is hard to imagine a successful Fourth Amendment challenge to the seizure of a gun once discovered under circumstances like these. In fact, it is not clear that Hatcherson-Ross even raises a challenge to the search of the backyard and storage bin independent of his claim that he was seized before entering the backyard. He did not clearly raise such a challenge before the trial court. But given the parties' and the trial court's general confusion that this all hinged on the abandonment doctrine, we will charitably read him as having preserved this challenge at trial and raised it on appeal.

relinquished his privacy interests in the searched backpack that he hid near where he was stopped); *Biles*, 101 A.3d at 1024-25 (likewise examining whether defendant had abandoned a searched backpack and the items he hid underneath it); *Brown*, 97 A.3d at 96-97 (examining whether defendant had abandoned a jacket before officers searched its pockets); *United States v. Scott*, 987 A.2d 1180, 1189-90 (D.C. 2010) (examining whether searched automobile was abandoned); *Spriggs v. United States*, 618 A.2d 701, 702-03 (D.C. 1992) (examining whether defendant abandoned small metallic key case that officers searched and found heroin and cocaine inside of).

Now that we have identified the relevant question and cleared away the confusion about abandonment, the Fourth Amendment question about the legality of the search in this case becomes easy. "To raise a Fourth Amendment challenge to a search . . . a person must have a reasonable expectation of privacy in the" property that is searched. *Brown*, 97 A.3d at 95. Hatcherson-Ross had no Fourth Amendment interest in the stranger's backyard or storage bin, so the officers' search of those areas did not implicate his Fourth Amendment rights. A person of course does not gain an expectation of privacy in another's land or belongings by simply stashing something on or in them—they have left themselves at the whims of the property owner, and it is that property owner's privacy interests that are implicated by a police search of their property. *See Rawlings v. Kentucky*, 448 U.S. 98, 104-06 (1980) (defendant who put drugs in companion's purse had "no legitimate expectation of

privacy" in that purse so search of it did not implicate his Fourth Amendment rights). Because Hatcherson-Ross's rights were not implicated by the search of a stranger's backyard and the storage bin therein, he does not have a colorable Fourth Amendment challenge to those searches.

### III. Conclusion

For the foregoing reasons, we affirm the trial court's denial of Hatcherson-Ross's motion to suppress and affirm his convictions.

*So ordered.*